In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-2529

DEREK HANNEMANN,

*Plaintiff-Appellant,*

*v.*

SOUTHERN DOOR COUNTY SCHOOL DISTRICT,
JOE INNIS, LOIS MAHAFFEY, AND STEVE BOUSLEY,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 09-CV-01055—**William C. Griesbach**, *Judge.*

ARGUED JANUARY 20, 2012—DECIDED MARCH 15, 2012

Before FLAUM and ROVNER, *Circuit Judges*, and
CASTILLO, *District Judge*.[*]

FLAUM, *Circuit Judge*. Derek Hannemann filed a § 1983
action against Southern Door County School District,

---

[*] The Honorable Ruben Castillo, District Judge for the
United States District Court for the Northern District of Illinois,
sitting by designation.

Superintendent Joe Innis, Principal Lois Mahaffey, and Assistant Principal Steve Bousley, seeking damages and injunctive relief. Hannemann alleged that defendants violated his rights under the Fourteenth Amendment's Due Process Clause based on his suspension and expulsion from Southern Door County High School. He further alleged that defendants violated his procedural due process rights and his right to intrastate travel by banning him indefinitely from school property. The district court granted defendants' motion for summary judgment as to all claims.

Hannemann only appeals the portion of the district court's decision related to the ban. Although he previously argued that the ban violates his liberty interest as a student, he now argues that the ban violates his liberty interest as a general member of the public, conceding that he was no longer a Southern Door student at the time the ban was imposed. We affirm the district court's grant of summary judgment and hold that Hannemann, as a member of the public, does not have a protected liberty interest in accessing school grounds. Defendants thus had no obligation to provide Hannemann with process in connection with its imposition of the ban from school grounds.

## I. Background

Derek Hannemann was a ninth grade student at Southern Door County High School in Southern Door County School District during the 2005–2006 school year. On May 1, 2006, a student reported seeing Hannemann with

a knife on the school bus three days earlier. Assistant Principal Bousley questioned Hannemann about this incident, prompting Hannemann to turn over his knife and to explain that he was afraid of "getting jumped." The school district's weapons policy forbids students from knowingly or voluntarily possessing a weapon. If a student brings a weapon to school, school officials must confiscate the weapon, notify the student's parents, and hold an administrative hearing. The policy also authorizes school officials to suspend the student for up to fifteen days and to recommend expulsion to the district administrator. School officials informed Hannemann's father, Rick Hannemann, that his son had brought a knife to school. Bousley met with both of them to discuss the incident and told them that Hannemann was suspended.

The Board of Education of the Southern Door County School District scheduled a hearing to determine whether grounds existed for expulsion. Superintendent Innis issued a Notice of Hearing to the Hannemanns on May 11, 2006, and the hearing was held on May 22, 2006 with the Hannemanns in attendance. The Board of Education voted to expel Hannemann for engaging in conduct that endangered the property, health, or safety of others. Although the expulsion order applied until he turned twenty-one, the order allowed for early reinstatement for the 2006–2007 school year, conditioned upon "no further incidents of gross misconduct described in the student handbook."

Hannemann took advantage of the conditional reinstatement option and returned to Southern Door County

High School the following year. No further incidents occurred until April 27, 2007, when Assistant Principal Bousley learned that the statement, "Only one bullet left, no one to kill but myself," was written on Hannemann's backpack. Bousley met with Hannemann and his father. After they left the school, Hannemann returned by himself and accused Bousley of taking his notebooks. Then-Principal Mahaffey brought Hannemann into her office to determine what the problem was. He was visibly upset, clenching his fists and breathing heavily. Based on his behavior, he received a discipline referral for violating the school district's policy against intimidation and harassment.

On May 1, 2007, another incident occurred. A teacher brought Hannemann to the principal's office for grabbing another student by the collar in class and saying, "I am going to kick your ass. Stop writing in my locker." The next day, Assistant Principal Bousley and Principal Mahaffey met with Hannemann and his father. Bousley informed them that the expulsion order was under review and that they would have an opportunity to be heard on this issue. On May 4, Innis, Bousley, Mahaffey, Hannemann, his parents, and his attorney met to discuss the situation and possible expulsion. A few days later, Hannemann's attorney mailed Innis letters from Hannemann and his parents to demonstrate their commitment to a joint solution.

On May 7, 2007, Hannemann was suspended for these recent incidents as well as for a separate incident in which Hannemann punched a student. That evening, the Board

of Education discussed Hannemann's recent behavior in a closed meeting. Although the Board of Education agreed that the administrators' decision to revoke his conditional reinstatement and to expel him was appropriate, they did not vote on this matter because the decision rested solely with the administrators. A letter dated May 11, 2007 informed the Hannemanns that the school district had decided to enforce the permanent expulsion due to Hannemann's violation of the condition in the original expulsion order.

Hannemann's attorney requested a hearing to contest the revocation of the reinstatement. Superintendent Innis and other administrators met with the Hannemanns on May 17, but on June 5 the Hannemanns received written notification that the permanent expulsion would remain in effect. Hannemann enrolled in Fox Valley Lutheran High School for the 2007–2008 school year, but he continued to appeal the expulsion decision.

In September 2007, Hannemann appealed his original expulsion to the superintendent of the Wisconsin Department of Public Instruction. On November 5, the state superintendent reversed Hannemann's expulsion on the ground that the May 11, 2006 notice of expulsion was defective because it did not identify the time frame of the alleged conduct.

Despite the reversal of his expulsion, Hannemann decided not to return to Southern Door County High School, in part because he had become accustomed to his private school and in part because the school district had indicated that it would appeal the state superin-

tendent's decision if Hannemann decided to return. Though enrolled at Fox Valley Lutheran High School, Derek continued to use Southern Door County High School's weight room and to drive onto school grounds to pick up friends. On May 28, 2008, a teacher saw Hannemann in the weight room and told him to leave. Hannemann became agitated and confrontational, used inappropriate language, and punched a locker. School officials relied on the teacher's account of the incident and informed Hannemann by mail that he was "no longer to enter upon the property of the Southern Door County School district for any purpose effective immediately." The letter explained that any entry would be considered a trespass. The Hannemanns were not provided with notice or opportunity to be heard concerning this ban. Hannemann's attorney sent a letter to the school district's attorney inquiring into the school district's authority to impose such a ban, but he received no response. The Hannemanns did not follow up by requesting a hearing or by inquiring how the ban could be lifted. On June 4, 2008, Derek drove onto school property to pick up a friend. A police officer pulled him over and issued a citation for trespassing.

Hannemann filed a complaint on November 10, 2009, raising claims related to bullying, his suspension, his expulsion, and his ban from school property. He challenged the ban on First Amendment, equal protection, and due process grounds. On November 1, 2010, Hannemann filed an amended complaint, adding due process claims for the suspension and expulsion and removing the bullying claim. He alleged that: (1) the

May 3, 2007[1] five-day suspension deprived him of liberty or property without procedural due process; (2) the expulsion order deprived him of liberty or property without procedural due process; (3) the ban on entering school property without notice or a hearing deprived him, as a student, of procedural due process; and (4) the ban on entering school property violated his right to intrastate travel. Hannemann sued Southern Door County School District, as well as Superintendent Innis, former Principal Mahaffey, and Assistant Principal Bousley in their individual capacities.

The district court granted defendants' motion for summary judgment, concluding that Hannemann was not denied procedural due process with respect to his suspension, his expulsion, or the revocation of his conditional reinstatement. Regarding the ban, the district court rejected Hannemann's argument that he had student status when he was banned from the premises.

---

[1] The district court referred to this alternatively as the May 2006 suspension and the May 2007 suspension. According to the facts alleged in Hannemann's amended complaint, he was suspended both on May 1, 2006 for fifteen days (following the knife possession) and on May 3, 2007 for five days (following a series of altercations). It appears that Hannemann alleged a violation only relating to the 2007 suspension but that the district court considered whether due process was provided in conjunction with the 2006 suspension. We need not resolve this issue, however, because Hannemann only appeals the district court's decision about his ban from school grounds.

The court held that a school is permitted to indefinitely ban a non-student from its property because members of the public have no constitutional right to access public schools. The court also held that the right to intra-state travel is not unlimited and does not provide a right to access school property. Finally, the court held that the individual defendants are entitled to qualified immunity as an alternative basis for granting summary judgment as to them because even if the court erred by failing to find a constitutional violation, the law was not clearly established.

On appeal, Hannemann only contests the district court's grant of summary judgment for his procedural due process claim for equitable relief from the ban from school property.

## II. Discussion

We review de novo a district court's grant of summary judgment. *Smeigh v. Johns Manville, Inc.*, 643 F.3d 554, 560 (7th Cir. 2011). Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). However, "[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The non-movant must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250. We construe all facts and draw all rea-

sonable inferences in the light most favorable to the non-moving party, which in this case is Hannemann. *Smeigh*, 643 F.3d at 560. Nevertheless, "we are not required to draw every conceivable inference from the record. We need draw only reasonable ones." *Tyler v. Runyon*, 70 F.3d 458, 467 (7th Cir. 1995).

### A. Whether the Ban from School Grounds Violates a Liberty Interest Protected by the Due Process Clause

Hannemann contends that the school district violated his right to procedural due process by banning him from school property without notice and an opportunity to be heard. Before the district court, Hannemann argued that his status as a student entitled him to this process. The district court rejected this argument, finding it to be "undisputed that Derek was not a student at Southern Door County High School when the ban was instituted" because expulsion transforms a person's status from student to general member of the public. Although the expulsion order had been vacated, Hannemann had opted not to reenroll. Thus, when the ban was enacted, Hannemann was not a student of Southern Door County High School, but rather of Fox Valley Lutheran High School. The district court framed the issue as whether a school district can constitutionally ban a non-student from its property until further notice without a hearing, and the court ruled that the school district has this authority.

On appeal, Hannemann abandons his student-status argument and instead argues that he was deprived of a

protected interest as a general member of the public. Hannemann is not consistent or precise in alleging what protected interest has been violated by the ban. He argues that a school in a small community serves as more than a place of learning,[2] that a ban from school grounds is especially burdensome to parents, that other members of the community enter school property, and that a ban that labels a person as a danger to children imposes a grievous loss.

When a plaintiff asserts a procedural due process claim, we engage in a two-fold analysis. First, we must determine whether the plaintiff was deprived of a protected interest, either in liberty or property. *McMahon v. Kindlarski*, 512 F.3d 983, 987 (7th Cir. 2008). Second, if the plaintiff has established a protected interest, we must determine what type of process is due. *Id.* at 987-88. "Protected liberty interests 'may arise from two sources—the Due Process Clause itself and the laws of the States.'" *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460

---

[2] Hannemann alleges that, due to the small size of the community, Southern Door County schools serve not simply as educational institutions but also as the center of civic life. Hannemann does not provide any legal or factual support for this assertion, and he conceded at oral argument that there is no evidence in the record of specific civic events that take place on the school grounds. To the extent that Hannemann claims that his right to access school grounds stems from the community's small size, we find this claim to be unsupported and therefore waived. *See Long v. Teachers' Retirement Sys. of Ill.*, 585 F.3d 344, 349 (7th Cir. 2009).

(1989) (quoting *Hewitt v. Helms*, 459 U.S. 460, 466 (1983)). As the Supreme Court has stated, "the range of interests protected by procedural due process is not infinite." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 569-70 (1972).

Before we can evaluate whether Hannemann has established a protected interest, we must decide whether to construe the duration of the ban as definite (as the school district argues), indefinite (as the district court determined), or lifelong (as Hannemann argues). The duration of the ban influences the severity of the school district's action and thus may influence our analysis as to whether the ban violates a protected interest.

It is undisputed that the letter from the school district's attorney informing Hannemann of the ban does not state when the ban will be lifted. When asked at a deposition whether Hannemann would be permitted to attend events that are open to the public after he turns twenty-one, Superintendent Innis testified, "we certainly would be open to revisiting it if a request was made, you know, to attend activities or, you know, be on the campus."

The district court concluded that there was no evidence that the district intended for the ban to be lifelong and that such an interpretation would not be reasonable. We agree with the district court's analysis, and we construe the ban as indefinite but not necessarily permanent. Although Hannemann claims that the ban is lifelong, he never asked school officials how long the ban would last for or whether there was anything he

could do to have it lifted. Similarly, Hannemann never asked school officials to lift the ban and never promised to refrain from the conduct that prompted the ban. Further, Innis's testimony suggests that school officials are open to reconsideration. Yet we must reject defendants' assertion that the ban was neither indefinite nor unconditional, as defendants have not pointed to any evidence of an end date for the ban or conditions for Hannemann to meet for the ban to be lifted. We therefore conclude, as the district court did, that the ban from school property was indefinite but not permanent.[3]

### 1. Hannemann's Ban from School Grounds Did Not Deprive Him of a Protected Liberty Interest Under the "Stigma Plus" Framework

Hannemann first claims that his ban from school grounds deprived him of a protected liberty interest. A plaintiff may prove a deprivation of a protected liberty interest by showing damage to his "good name, reputation, honor, or integrity." *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971). This "stigmatic harm," however, "must take concrete forms and extend beyond mere reputational interests." *Omosegbon v. Wells*, 335 F.3d 668, 675 (7th Cir. 2003) (citing *Paul v. Davis*, 424 U.S. 693, 711-12 (1976)); *see*

---

[3] If school officials refuse to consider a request to lift the ban and instead treat the ban as permanent, this conduct may implicate Hannemann's constitutionally protected rights; however, the evidence presently before us does not implicate those concerns.

*also McMahon*, 512 F.3d at 988. This two-pronged framework is known as the "stigma plus" test. *See Khan v. Bland*, 630 F.3d 519, 534 (7th Cir. 2010). The Supreme Court, in *Paul v. Davis*, made clear that procedural safeguards come into play only when the "alteration of legal status," such as the governmental deprivation of a securely held right, is "combined with the injury resulting from the defamation." 424 U.S. at 708-09. This occurs when defamatory statements alter or eliminate "a right or status previously recognized by state law." *Id.* at 711.

Hannemann urges us to evaluate his procedural due process claim using the approach that we have taken in employment cases involving protected liberty interests. This framework requires the plaintiff to show that he "was stigmatized by the employer's actions," that the "stigmatizing information was publicly disclosed," and that "he suffered a tangible loss of other employment opportunities as a result of the public disclosure." *Dupuy v. Samuels*, 397 F.3d 493, 509-10 (7th Cir. 2005); *see also McMahon*, 512 F.3d at 988. We have recognized this approach as "helpful" in certain non-employment cases. *See Dupuy*, 397 F.3d at 509-10.

Before considering the merits of Hannemann's liberty interest claim, we must address defendants' claim that Hannemann has waived his "stigma plus" argument by failing to raise it before the district court. Hannemann admits that he did not make this argument to the district court but explains that he responded only to the arguments raised by defendants in their motion for sum-

mary judgment. Hannemann's explanation is neither factually nor legally accurate.

Defendants argued in their motion for summary judgment that the ban did not violate Hannemann's procedural due process rights and that Hannemann failed to point to a state law or rule that entitled him to access school grounds. This argument called upon Hannemann to explain why, contrary to defendants' assertion, the ban did violate his procedural due process rights. Yet Hannemann did not argue to the district court, as he does on appeal, that his protected interest stems from harm to his reputation combined with an alteration of legal status (i.e., the "stigma plus" test). Hannemann exclusively argued that he had a constitutional right stemming from his student status and insisted that he was not a "mere member of the public."

"It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered. If it does not do so, and loses the motion, it cannot raise such reasons on appeal." *Liberles v. Cnty. of Cook*, 709 F.2d 1122, 1126 (7th Cir. 1983); *see also Domka v. Portage Cnty.*, 523 F.3d 776, 783 (7th Cir. 2008). Although Hannemann contends that he raised the stigma plus argument sufficiently to preserve it for appeal, a party "waive[s] the ability to make a specific argument for the first time on appeal when the party failed to present that specific argument to the district court, even though the issue may have been before the district court in more general terms." *Fednav Int'l Ltd. v.*

*Cont'l Ins. Co.*, 624 F.3d 834, 841 (7th Cir. 2010). Even giving a generous reading to Hannemann's arguments before the district court, we are unable to detect any argument based on a liberty interest in Hannemann's reputation or any liberty interest for general members of the public. We therefore conclude that Hannemann has waived his stigma plus argument because he raises it on appeal for the first time.

Even if we declined to find this argument waived, the argument would fail on its merits. Hannemann has not identified any statements made by the school district that would constitute defamatory statements if false. *See Brown v. City of Michigan City*, 462 F.3d 720, 730 (7th Cir. 2006)*. Although he claims that the school district has "affixe[d] a badge of infamy" to him, he does not allege that the school district publicized the ban[4] or that he has been harassed due to publication of the ban. *See id.*; *Omosegbon*, 335 F.3d at 675. Thus, Hannemann has not satisfied the "stigma" prong.

Hannemann has not satisfied the "plus" prong either because he has not established that any defamatory

---

[4] Hannemann alleged in his amended complaint that a flyer was distributed to Southern Door County school personnel, referencing the May 2008 "confrontation" in the weight room and instructing personnel to contact the administration or the police if Hannemann was spotted on school property. Hannemann has never pointed to any defamatory statements in the flyer or argued that its distribution had the effect of depriving him of his liberty interest in his reputation. Hannemann, in fact, makes no mention of the flyer on appeal.

statements have caused an alteration in his legal status. *See Paul*, 424 U.S. at 711; *Brown*, 462 F.3d at 730-32. We have previously found this prong to be satisfied when an employee's reputation or integrity was called into question in a manner that made it almost impossible for the employee to find a new position in that field. *See Townsend v. Vallas*, 256 F.3d 661, 669-70 (7th Cir. 2001). The Supreme Court has also recognized a change in legal status when a student was deprived of the right to attend public school. *See Paul*, 424 U.S. at 710 (discussing *Goss v. Lopez*, 419 U.S. 565 (1975)). Hannemann has not established that any stigma resulting from the ban has caused him to lose a right previously recognized by state law.[5] As the district court acknowledged, Southern Door County School District allows the public to enter school property for specific purposes while retaining the authority to bar individual members of the public for reasons specific to them. Hannemann does not contest

---

[5] Hannemann makes two statements that could possibly give rise to cognizable interests, but he fails to adequately support these statements. He contends that Southern Door County High School is a polling place, but he never establishes (or even asserts) that the high school is *his* polling place, that absentee voting is unavailable, or that school officials intend to enforce the ban during an election. Hannemann also contends that the ban prevents a parent from attending parent-teacher conferences, concerts and sporting events, and even graduation—but Hannemann is not presently and may never become a parent of a Southern Door student. Thus, though voting and parental interests may be stronger, Hannemann has not established that he has been deprived of these interests.

this finding, and he even urges us to grant summary judgment in his favor on the ground that there are no material facts in dispute. Because the school district retains the discretion to bar members of the public from school property, Hannemann is unable to establish the loss of a previously recognized right.

Case law also supports our holding that members of the public do not have a constitutional right to access school property. In *Vukadinovich v. Board of School Trustees of Michigan City Area Schools*, a principal banned a former teacher from a public school who had continued to enter school grounds after being terminated. 978 F.2d 403, 407 (7th Cir. 1992). We determined that Vukadinovich became a member of the public once discharged, and we stated that "[m]embers of the public have no constitutional right of access to public schools." *Id.* at 409. Hannemann seeks to distinguish *Vukadinovich* as only involving rights under the First Amendment, which Hannemann no longer alleges. Even though we did not analyze due process rights in *Vukadinovich* (due to defendants' concession that Vukadinovich had a protected property interest in his employment), we recognized, as the baseline for our analysis, that the public has no constitutional right to access schools. The First Amendment framework then required Vukadinovich to allege that a governmental body or authority had transformed the school into a public form, which he failed to do. The same baseline determination—that the public has no constitutional right to access schools—applies to Hannemann's claim. The "stigma plus" due process framework requires Hannemann to establish that defamatory statements

caused him to lose a right recognized by state law, which he has failed to do. Hannemann has at most alleged a right to access school grounds stemming from a Southern Door County School District policy, but this does not suffice. *See Paul*, 424 U.S. at 711.

Cases from other circuits have similarly held that members of the public do not possess a constitutionally protected right to access school grounds. *See, e.g.*, *Lovern v. Edwards*, 190 F.3d 648, 655-56 (4th Cir. 1999) (affirming the dismissal of a parent's claim regarding his ban from school property and stating that "[s]chool officials have the authority to control students and school personnel on school property, and also have the authority and responsibility for assuring that parents and third parties conduct themselves appropriately while on school property"); *Henley v. Octorara Area Sch. Dist.*, 701 F. Supp. 545, 551 (E.D. Pa. 1988) ("The right to come onto the school property was not such a right as to require any sort of a due process hearing before making the classification that excluded [the non-student].").[6] Hannemann points to *Dunkel v. Elkins,* 325 F. Supp. 1235, 1245 (D. Md. 1971),

---

[6] Hannemann urges us to distinguish these cases as concerning the broader right to access all school buildings at all times, but we decline to do so. The holdings in these cases are not limited to claims of unbounded access to schools. Moreover, Hannemann does not clearly allege a narrower claim. The conduct that prompted the ban was his presence in the school's weight room, and his briefing seeks access to school property for wide-ranging purposes, including sporting events, voting, concerts, and parent-teacher conferences.

a case in which the court held that a public university could not deprive a person of access to the campus without a prior administrative hearing. We do not find *Dunkel*'s reasoning to be persuasive as to Hannemann's claim. The district court in *Dunkel* did not provide much support for the origin of the right to process and appeared to rely primarily on the ease with which the university could have provided a hearing. Moreover, safety and administrative concerns are heightened in the context of grade schools, and there is no indication that *Dunkel* would have extended its right of access from universities to grade schools.

### 2.  Hannemann's Ban from School Grounds Did Not Interfere with His Right to Intrastate Travel

Liberty interests may arise from the Due Process Clause itself, *see Thompson*, 490 U.S. at 460. Hannemann appears to claim that he has a liberty interest in engaging in intrastate travel and that the ban from school grounds violated this interest. The district court rejected this argument, concluding that "[t]he right to intrastate travel does not allow one to travel any-where and everywhere within Wisconsin at his or her pleasure." We agree with the district court's well-rea-soned analysis, and we hold that Hannemann's ban from school property does not violate his right to intrastate travel.

The Wisconsin Supreme Court has recognized the right to travel as "fundamental among the liberties pre-served by the Wisconsin Constitution." *Brandmiller v.*

*Arreola*, 544 N.W.2d 894, 899 (Wis. 1996). We have not yet decided whether there is a federal fundamental right to intrastate travel, *see Schor v. City of Chicago*, 576 F.3d 775, 780 (7th Cir. 2009), but there is no need to resolve this question today because Hannemann has not established that the ban actually violates his right to intrastate travel. Hannemann has not alleged that the ban inhibits his ability to move from place to place within Door County. He has not alleged that the only way to get from one location to another is to traverse school property, nor has he alleged that the ban prevents him from accessing substantial portions of the county. The absence of such allegations signals that Hannemann's claim is not properly characterized as an infringement of his right to intrastate travel. He contends that the ban prevents him from entering school grounds for various activities, but he never contends that the ban inhibits his right to travel through parts of the county to participate in such activities. *See Doe v. City of Lafayette*, 377 F.3d 757, 771-72 (7th Cir. 2004) (en banc) (holding that the city's ban of a sex offender from city parks did not violate his right to intrastate travel since ban did not limit him "in moving from place to place within his locality to socialize with friends and family, to participate in gainful employment or to go to the market to buy food and clothing").

Hannemann relies on *Johnson v. City of Cincinnati*, 310 F.3d 484, 495 (6th Cir. 2002), in which the Sixth Circuit concluded that expansive "drug exclusion zones" interfered with plaintiff's "right to travel locally through public spaces and roadways." We have previously ques-

tioned *Johnson*'s recognition of the right to intrastate travel as fundamental, *see Lafayette*, 377 F.3d at 771 & n.12, but we need not revisit that issue here because Hannemann has not sufficiently established that the ban limits his right to travel locally.

Even if we construe Hannemann's intrastate travel claim as arguing that he has the right to enter public facilities and remain there, his claim fares no better. The right to intrastate travel protects the right to move from place to place, not the right to access certain public places. *See Williams v. Town of Greenburgh*, 535 F.3d 71, 75-76 (2d Cir. 2008) ("[I]t is clear that the right [to intrastate travel] protects *movement between places* and has no bearing on *access* to a particular place."). As the Second Circuit has recognized, "it would distort the right to free travel beyond recognition to construe it as providing a substantive right to cross a *particular* parcel of land, enter a *chosen* dwelling, or gain admittance to a *specific* government building." *Id.* at 76. Just as the right to intrastate travel does not confer the right to access to community centers and government office buildings, *see id.*, it also does not confer the right to access school property.

Although we acknowledge that a three-Justice plurality of the Supreme Court has expressed that "the freedom to loiter for innocent purposes is part of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment," *City of Chicago v. Morales*, 527 U.S. 41, 53-54 (1999), we do not perceive this dicta as compelling our recognition of a liberty interest in unfettered access to

school grounds. *See United States v. Lock*, 466 F.3d 594 (7th Cir. 2006) (referring to the *Morales* statement as a "controversial proposition"). *But see Kennedy v. City of Cincinnati*, 595 F.3d 327, 330 (6th Cir. 2010) (relying on *Morales* and recognizing a "constitutionally-protected liberty interest not to be banned from all City recreational property without procedural due process"). The *Morales* statement is situated not in the context of a due process analysis but rather in the context of an overbreadth analysis. Further, the only cases cited by the plurality involve the freedom of movement, not the freedom to loiter. Moreover, even if we recognized some liberty interest in the right to loiter, it would not follow that this right confers unfettered access to all public places. In *Doe v. City of Lafayette*, we rejected the notion that *Morales* signifies the Supreme Court's mandate that a right to loiter in all public places is a fundamental liberty interest. 377 F.3d at 772. We determined that the *Morales* statement "hardly includes all the contexts of 'public' places—for example, parks, public schools, jails, libraries, governmental administration buildings." *Id.*

We are not prepared to recognize a right for members of the public to loiter on school grounds based on the broad language in *Morales*. Our reluctance to construe *Morales* so broadly stems in part from the Supreme Court's own statements about the authority and the responsibility of school officials to protect students and control people on school property. *See, e.g.*, *New Jersey v. T.L.O.*, 469 U.S. 325, 339 (1985) (recognizing the "substantial interest of teachers and administrators in maintaining discipline in the classroom and on school

grounds"); *Carey v. Brown*, 447 U.S. 455, 470-71 (1980) (stating that the Constitution does not leave state officials powerless "to protect the public from boisterous and threatening conduct that disturbs the tranquility of . . . schools" (quoting *Gregory v. Chicago*, 394 U.S. 111, 118 (1969) (Black, J., concurring))); *see also Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 656 (1995) ("Fourth Amendment rights, no less than First and Fourteenth Amendment rights, are different in public schools than elsewhere . . . ."); *Lovern*, 190 F.3d at 655-56. We therefore hold that Hannemann has not established that the ban deprived him of a protected liberty interest, whether stemming from the "stigma plus" framework or the right to intrastate travel.

### B.  Qualified Immunity

The district court concluded that qualified immunity provided an alternative basis for granting summary judgment to individual defendants Innis, Mahaffey, and Bousley. Hannemann does not challenge this conclusion as to damages, but he contends that qualified immunity does not bar declaratory and injunctive relief. He seeks the opportunity to be heard if the school continues to ban him from school property. Hannemann is correct; the defense of qualified immunity does not protect defendants from an action for injunctive relief. *See Moss v. Martin*, 614 F.3d 707, 712 (7th Cir. 2010); *Denius v. Dunlap*, 330 F.3d 919 (7th Cir. 2003). But even though qualified immunity does not provide a complete defense to individual liability, *see Canedy v. Boardman*, 91 F.3d 30, 33

(7th Cir. 1996), defendants all prevail on the merits of this action. Hannemann has failed to establish that defendants' imposition of an indefinite ban from school grounds deprived him of any constitutionally protected interests.

## III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.